Submitted on remand from the Oregon Supreme Court August 30, 2006,
reversed and remanded April 25, 2007

## STATE OF OREGON,
*Respondent,*

*v.*

## JAMISON LEE ENNIS,
*Appellant.*

## Marion County Circuit Court
99C41999; A111389

158 P3d 510

Laura Graser filed the brief for appellant.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Kaye E. McDonald, Assistant Attorney General, filed the brief for respondent.

Before Landau, Presiding Judge, and Schuman and Ortega, Judges.

LANDAU, P. J.

## LANDAU, P. J.

In 2000, a jury found defendant guilty of one count of felony murder. ORS 163.115(1)(b)(C). The trial court sentenced him under ORS 137.700 to 300 months in prison and lifetime post-prison supervision. Defendant appealed on the ground that the trial court, among other things, had erroneously admitted hearsay statements of a codefendant in violation of defendant's confrontation rights guaranteed by the Sixth Amendment to the federal constitution. This court affirmed his conviction without opinion. *State v. Ennis*, 186 Or App 742, 66 P3d 1029 (2003).

In the meantime, the United States Supreme Court decided *Crawford v. Washington*, 541 US 36, 124 S Ct 1354, 158 L Ed 2d 177 (2004), concerning the extent to which the Sixth Amendment permits the admission of "testimonial" hearsay statements. Shortly after that, defendant petitioned for review in the Oregon Supreme Court. The Supreme Court held the petition in abeyance pending the resolution of another case involving the application of *Crawford*. Shortly after reaching a decision in that case, *State v. Cook*, 340 Or 530, 135 P3d 260 (2006), the court allowed defendant's petition for review, vacated our decision, and remanded for reconsideration in light of *Crawford* and *Cook*. *State v. Ennis*, 341 Or 197, 140 P3d 580 (2006). We allowed the parties' joint motion to file supplemental briefing concerning the impact of *Crawford* and *Cook* on the issues raised in defendant's appeal. On reconsideration, we now reverse and remand.

## I.   FACTS

In view of the nature of defendant's challenges to his conviction, we begin with a summary of the underlying facts, which are undisputed, and then turn to a more detailed examination of the evidence at defendant's trial.

### A.   *Undisputed facts*

Defendant sold drugs to the victim, Patrick Murphy, on approximately 10 occasions. Early in the morning of October 28, 1998, defendant and two other men, Michael Benson and Brian Hudson, drove defendant's car and a U-Haul truck to Murphy's residence in Salem. When the

three arrived at the house, Murphy brought them into the garage where another man, Perrotte, was smoking methamphetamine.

Defendant asked Murphy about certain statements that Murphy reportedly had made to defendant's girlfriend. Benson interrupted the conversation, and the conversation between Benson and Murphy became heated. Benson and Murphy went into the house. Meanwhile, Hudson carried various items, including guns, ammunition, and tools, outside to the U-Haul truck. Eventually, two shots were heard. Perrotte drove away in Murphy's vehicle. Benson and Hudson left in the U-Haul. Defendant left in his car. No one reported the shooting to the police.

On December 14, 1998, Salem police went to Murphy's residence on a report of an abandoned house. They found Murphy's body in the kitchen. He had been killed by a single gunshot to the chest and had been dead for approximately six weeks. There was a small amount of methamphetamine in the house, along with needles, smoking paraphernalia, empty gun boxes, and ammunition. The house had been burgled on several occasions after Murphy's death; two bedrooms appeared to have been ransacked.

As part of the investigation into Murphy's death, Salem Police Detectives Stoelk, Quakenbush, and Rawlins separately interviewed Hudson. Detective Quakenbush also interviewed an inmate of the Marion County Jail, Jacobs, who had had conversations with Hudson in the jail in January 1999. Detective Graham interviewed two acquaintances of Hudson named Silsby and Morgan, who described statements Hudson had made to them.

Defendant, Benson, and Hudson eventually were indicted for two counts of felony murder committed in the course of committing the crimes of, respectively, burglary in the first degree and robbery in the first degree. ORS 163.115(1)(b)(C), (G). The state's theory was that defendant, Benson, and Hudson went to Murphy's residence to collect a drug debt or to confront Murphy about threats that he had made against defendant's girlfriend and that, while they were there, Murphy and Benson engaged in an altercation

that ended with Benson shooting Murphy. Defendant asserted an affirmative defense under ORS 163.115(3).[1]

Before trial, defendant moved to sever his trial from that of his codefendants. The trial court denied the motion. The state moved for admission of redacted versions of Hudson's various statements; the redactions purportedly would eliminate any references by Hudson to defendant or Benson and the statements would then be read into the record by the relevant witnesses. The trial court granted the motion.

## B. *Trial*

The state's case-in-chief consisted primarily of the testimony of Murphy's friend Perrotte and the introduction through various witnesses of redacted versions of Hudson's statements. Perrotte testified that, on certain occasions in 1998, he was present with Murphy when defendant came to Murphy's house and, after defendant left, "there were drugs." He testified that, on the night of the murder, he arrived at Murphy's house around 11:00 p.m.; that he and Murphy snorted and smoked methamphetamine; that he, Perrotte, "might have been drinking a beer"; and that he "had a buzz."

Perrotte testified that, after defendant and his codefendants arrived, Murphy and Benson got into an argument that escalated into an altercation and that Benson tried to shoot Murphy with a crossbow, which did not fire, and then hit him with a phone. The "scuffle" then "moved into the house." Perrotte said that he could hear yelling and banging. At some point, he said, "guns came out."

---

[1] ORS 163.115(3) provides:

"It is an affirmative defense to a charge of violating subsection (1)(b) of this section [setting out the crime of felony murder] that the defendant:

"(a) Was not the only participant in the underlying crime;

"(b) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid in the commission thereof;

"(c) Was not armed with a dangerous or deadly weapon;

"(d) Had no reasonable ground to believe that any other participant was armed with a dangerous or deadly weapon; and

"(e) Had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death."

Perrotte testified that defendant had a gun that looked like a large pistol or a small automatic with a large clip. Perrotte also testified that, after Murphy and Benson went into the house, defendant threw a roll of duct tape into the house and that, while Murphy and Benson were in the house, defendant was "keeping an eye on me" in the garage "[w]ith the gun." Perrotte testified that defendant was directing Hudson "a little bit" in "rounding up" Murphy's property and taking it out to the truck. He stated that he believed that two long guns that were taken from the house belonged to defendant. Perrotte testified that, at the time Murphy was shot, defendant was in the garage, as was the person gathering up property.

On cross-examination, Perrotte reiterated that, when defendant was "running around the garage, he had a gun in his hand." He acknowledged, however, that he had told Detective Graham that defendant was not brandishing his gun at him. Also on cross-examination, Perrotte admitted that he initially lied to officers who questioned him about Murphy's death, that he drove Murphy's vehicle after Murphy died, and that he possessed and used methamphetamine on the night Murphy died. He further testified, however, that he had never been charged with obstruction of justice, unauthorized use of a motor vehicle, or possession of a controlled substance. Perrotte also testified that he had not been promised anything in exchange for his testimony in defendant's trial.

Detective Stoelk testified that he interviewed Hudson in February 1999. He read into the record a redacted version of the statement Hudson had made to him. As pertinent here, the redacted statement stated:

"Brian Hudson said that he had been staying at * * * Salishan Street with his girlfriend Stephanie Silsby [and] with a Jonathan Morgan * * *. Hudson knows Michael Benson and Jamison Ennis [that is, defendant]. He attended high school with Ennis and considered him to be a friend for some time. He met Benson only recently. * * * [O]ne day between 3 and 5 a.m. Hudson was at the Salishan residence * * *. There was a knock on the door, and Stephanie answered the door. Hudson went outside. There

was a Honda car and a U-Haul truck. * * * Hudson got into the Honda and went to Waremart and met the U-Haul.

"They went to a house. He did not know the person who lived at the house. At the house, the U-Haul was parked in the driveway * * *. Murphy [the victim] answered the door * * *. Murphy let him into the house. Hudson went into the garage. Someone else was there. Murphy and the other person were smoking methamphetamine. He did not know the other person's name. He watched what happened in the garage. Murphy went into the house. Hudson heard loud crashing noises and thudding noises that sounded like a body hitting the wall. After a while, Hudson saw Murphy fall backwards into the garage, landing on the floor. He saw Murphy get hit in the head with a handgun. There was a large gash in Murphy's head that was bleeding quite a bit. There was duct tape placed around the wound on Murphy's head. Hudson, following directions by one of the other persons present, began packing up Murphy's tools. * * * Hudson went inside the house to a back bedroom that appeared to serve as an office to get guns from that room. * * * As Hudson was in the office, he saw Murphy in the bedroom. It appeared that things were calmer. Murphy no longer had the duct tape on. When Hudson reentered the house after carrying the guns out, Hudson saw that Murphy was in the doorway leading into the office. Hudson thought Murphy had a gun. Hudson was handed a can of mace and told to go out in the garage and watch the guy in the garage. Hudson then loaded the welder and the two long rifles into the U-Haul truck. While outside, Hudson heard two loud pop noises from inside the house. The other person, who had been at the house when Hudson arrived, indicated that he wanted to leave, and Hudson did nothing to stop him from doing so. The other person left in a Chevy Blazer. Hudson left, riding as a passenger in the U-Haul truck. While riding in the U-Haul, one of the others handed Hudson a small black 22 automatic pistol. Hudson went in the U-Haul to a motel * * *. The property remained in the U-Haul truck. In the motel, Hudson, at the direction of one of the others there, removed the clip from the gun that had been handed to him in the U-Haul while leaving Murphy's house.

"* * * Hudson, at the direction of one of the others present, removed his clothing and put it into a duffel bag. * * * Hudson went to take back the U-Haul truck at about

10 a.m. Hudson took the U-Haul truck to the distributor * * * at the direction of one of the other persons present. * * * A safe and guns were removed from the U-Haul before it was returned. Those items were placed in another car.

"Hudson went back to his place and told Stephanie Silsby what had happened. He did not tell anyone else. Later on Hudson, at the direction of another person, went to Corky's to get some of the items that were taken there. Hudson went there and found that things had already been removed. He and another person later took some of the things from Corky but were unable to sell those things."

Detective Quakenbush also interviewed Hudson in February 1999. At trial, he testified to that effect and read into the record a redacted version of Hudson's statement to him, which stated in part that, "[w]hile he [that is, Hudson] was at Murphy's house, Murphy was beaten by one of the other persons present" and that "Murphy was stabbed in the leg * * * by one of the other persons present." The statement also stated that, "[a]fter the homicide, Hudson and the two others returned" to a motel.

Detective Rawlins testified that he spoke with Hudson in March 1999. He testified that Hudson told him that, on the night Murphy was shot, Hudson was driven to Murphy's residence; that he began collecting tools and guns; that Murphy was able to get a gun; that Hudson ran outside; that he heard gunshots; and that "they" then left the residence.

Detective Graham testified that he had interviewed Silsby on two occasions in February 1999; he read into the record a redacted version of the statements she had made. According to the redacted statement, Hudson had told Silsby that he and "others" had "taxed" someone; that "one of the other persons there" tried to shoot the victim with an "arrow gun"; that, at one point, "[o]ne of the other persons present took the gun that Hudson had"; that [t]he other two persons were in a room with the victim"; and that Hudson "and the others" stole the victim's property. Silsby also testified at trial; as pertinent here, she testified that she did not recall what Hudson told her or what she told Detective Graham.

Morgan testified that he knew Hudson and read into the record a redacted version of the statement he had made to Detective Graham in February 1999. The statement identified Hudson by name and stated that Hudson had told Morgan that he, Hudson, had been involved in an incident where "another person" had tried to shoot "a person" with a crossbow and that Hudson had said that it was "because the person owed the other person something."

Morgan also testified that, at the time of trial, he did not recall what he told Graham. He testified that, on the night of Murphy's murder, he was at the house on Salishan Street when defendant came to the house and that defendant had a duffel bag with guns in it, which defendant took with him when he left the house. On cross-examination, Morgan testified that, when he gave his statement to Graham in February 1999, he was "unclear" about what had occurred at the time of the murder; he also testified that he had very little knowledge about guns.

Jacobs testified that he met Hudson in the county jail and read into the record a redacted version of the statement that he, Jacobs, had made to Detective Quakenbush about what Hudson had told him in the jail. According to Jacobs's redacted statement, Hudson had told him that he "and others" went to a person's house to make the person apologize for "assault[ing]" two females, that "one of the persons he [that is, Hudson] was with began hitting the dude around," that "one of the persons had a gun," that the victim and "the other persons" went into a bedroom, that Hudson heard two gunshots, and that they loaded some items into a vehicle and left. According to the redacted statement, Hudson told Jacobs that he "thought they were just going over to teach—teach the guy some respect, but it got out of hand because of the beating." On cross-examination, Jacobs testified that his statement to the police was not accurate.

Defendant and Benson testified in their defense; Hudson did not testify. Defendant testified that he had known the victim, Murphy, for about a year and a half and that he went to Murphy's house on the day Murphy was killed to retrieve items belonging to him and because Murphy had insulted defendant's girlfriend. Defendant described

arriving at Murphy's house and going into the garage, and described Benson and Murphy engaging in an altercation. He also described telling Hudson to retrieve two rifles and a welder from Murphy's house and garage and to load them into the truck; according to defendant, all of those items belonged to him. Defendant testified that, while Hudson and Perrotte were outside near the truck, defendant heard two shots, then saw Benson run out of the house and get into the truck with Hudson. Defendant testified that he got into his car and left. Defendant testified that, on the night of the murder, he did not solicit or aid in the death of Murphy, that he was not armed, that he did not see or believe that Benson or Hudson had a weapon, that he did not expect Benson to engage in conduct likely to result in Murphy's death, and that he had no indication that there was going to be a fight; he testified, "There was not supposed to be a fight."

On cross-examination, defendant testified that he had known Hudson for "[q]uite a few years," that he knew both Benson and Murphy, and that Murphy did not know Benson. Defendant testified that he was one of Murphy's sources for methamphetamine and that Murphy never failed to pay him. Defendant testified that he was "disappointed" in Murphy when Murphy insulted two women friends of defendant and wanted to "cut off all ties with him." He testified that he took two people with him to Murphy's house because he needed a truck. Defendant denied that he went to Murphy's house to "levy a tax" on him, or to take things from Murphy "in reparation" for Murphy having purportedly insulted the women or to mitigate his losses from supplying Murphy with drugs; according to defendant, he took only his own possessions from Murphy's house. Defendant again denied that he had a gun with him or that he threatened Murphy with it. He denied that he "organized this entire thing" and then "helped cover it up."

Benson testified that, on the night of the murder, he was at a friend's apartment "partying," that is, using methamphetamine. Around 3:00 a.m. or 4:00 a.m., he recalled, defendant arrived. Defendant "started partying" with the people there and also asked Benson if he could use the U-Haul that Benson had rented. According to Benson, defendant wanted to pick up some property of his from a person

who had threatened defendant's girlfriend. Benson testified that he did not know the person but that he agreed to drive the U-Haul to the person's house. Defendant drove his own car, stopping first to pick up Hudson, whom Benson also did not know. Benson testified that, when defendant introduced him to Hudson, there was no "conversation" about "beat[ing] up or "ripping off" Murphy.

Benson testified that, when the three men arrived at Murphy's house, Murphy let them in and showed them to the garage, where Perrotte was smoking a glass pipe. Benson agreed that the scene at that point was "friendly"; he testified that Hudson began smoking methamphetamine with Perrotte and that defendant and Murphy were talking. After about five or 10 minutes, Benson approached defendant and Murphy. Benson heard defendant ask Murphy whether Murphy was going to apologize for his conduct toward defendant's girlfriend. Murphy did not apologize. Benson told Murphy that he was "out of line" and "tapp[ed]" him on the chest with the crossbow. Murphy "got aggressive and pushed" Benson, who pushed him back; Benson also picked up a cordless phone and smashed it on a shelf next to Murphy's head.

According to Benson, he and Murphy then went into the house, where, after talking briefly, they began pushing and punching each other. Murphy ended up in the garage, bleeding from a gash in his head. Murphy and Benson then went back into the house and into Murphy's bedroom, where they began smoking methamphetamine. Benson testified that Murphy pulled a gun out of a drawer and the two men moved down the hall to Murphy's office. Benson pulled his own gun out of his back pocket and shot Murphy. He ran out of the house and saw Hudson and Perrotte standing together on one side of the garage; defendant was in a different area. Benson testified that Perrotte left in one vehicle, he and Hudson left in the U-Haul truck, and defendant "ran to his car."

Benson testified that, during those events, he never saw defendant or Hudson in possession of a firearm; that he never had any discussions with defendant or Hudson about going to Murphy's house to take Murphy's property or

assault Murphy; that he never gave defendant any indication that he intended to engage in conduct likely to result in Murphy's death; that defendant never asked or encouraged him to assault or kill Murphy; that defendant never handed him any duct tape at Murphy's house; that, to his knowledge, no one, including defendant, knew that he was carrying the gun with which he shot Murphy; that he never displayed his gun to anyone; and that he did not go to Murphy's house with the intent to assault, kill, or rob him.

The jury found defendant guilty of murder committed in the course of committing the crime of first-degree burglary. The jury found defendant not guilty of murder committed in the course of committing the crime of first-degree robbery.

C. *Appeal*

In his original brief on appeal to this court, defendant assigned error to the trial court's denial of his motion to sever and to its admission of Hudson's redacted statements. As we have noted, this court affirmed without opinion. The Oregon Supreme Court subsequently vacated our decision and remanded to us for reconsideration in light of *Crawford* and *Cook*.

On remand, defendant reiterates his challenges, on federal Confrontation Clause grounds, to both the denial of his motion to sever and the admission of the redacted version of Hudson's statements. Specifically, defendant argues that, when the trial court allowed Hudson's redacted statements into evidence, it then erred in failing to sever defendant's trial from that of Hudson and Benson; conversely, he argues, when the trial court denied his motion to sever the trials, it erred in admitting Hudson's redacted statements. Relying on *Bruton v. United States*, 391 US 123, 88 S Ct 1620, 20 L Ed 2d 476 (1968), as further developed in *Richardson v. Marsh*, 481 US 200, 107 S Ct 1702, 95 L Ed 2d 176 (1987), and as applied by this court in *State v. Johnson*, 199 Or App 305, 312-13, 111 P3d 784, *rev den*, 339 Or 701 (2005), defendant argues that, notwithstanding the trial court's instructions to the jury to consider Hudson's various redacted statements only in determining Hudson's guilt or innocence, the references in the statements to "other persons present" and "accomplices"

were insufficient to hide defendant's identity and existence and therefore allowed the jury to infer that the anonymous persons referred to were defendant and Benson. He argues that the statements therefore amounted to statements against him that are subject to the newly announced constitutional rule in *Crawford* that uncross-examined testimonial hearsay cannot be used against a criminal defendant. Defendant also argues that that rule cannot depend on the jury's ability to follow the trial court's instruction to ignore the testimony. Finally, he argues that admission of the redacted statements was not harmless beyond a reasonable doubt; rather, it made a "significant addition" to the case against him. Defendant notes that the theory of his defense was that Benson shot Murphy; that, as both defendant and Benson testified, defendant neither was armed nor knew Benson was armed; and that, although Perrotte testified otherwise, he was impeachable.

In response, the state first argues that, in his original appeal, defendant abandoned the argument, made in the trial court, that admission of Hudson's redacted statements violated his confrontation rights. On the merits, the state contends that, consistently with *Richardson,* a properly redacted statement—one that does not facially incriminate a defendant—may be admitted with a proper limiting instruction. According to the state, such a statement is not offered against that defendant and therefore does not violate the defendant's Confrontation Clause rights. The state further argues that the holding in *Crawford*—and, derivatively, *Cook*—does not alter that analysis because, whether or not the relevant nontestifying codefendant's hearsay statements are testimonial, they were not admitted *against defendant.* In the state's view, *Crawford* neither overruled *Richardson* nor expanded *Bruton.* As a result, the state argues, "although the nontestifying codefendant might have a claim of *Crawford* error, the defendant does not." The state also argues that, although Silsby's statement to Detective Graham about Hudson's statements to her "probably" was testimonial, its admission did not contravene *Crawford* because Silsby was subject to cross-examination at trial. Finally, the state argues that, even assuming that admission of the statements was error under *Crawford,* the weight of

other evidence against defendant—particularly the testimony of Perrotte—rendered that error harmless.

## II.  ANALYSIS

■  As an initial matter, we reject the state's argument that, in his original appeal, defendant abandoned his Confrontation Clause argument. In his opening brief, defendant specifically argued that admission of the redacted statements was error under the Confrontation Clause, albeit, as noted above, in part on the ground that the statements lacked sufficient indicia of reliability—the aspect of Confrontation Clause jurisprudence that *Crawford* has now rendered obsolete.

A.  *Admissibility of the redacted statements*

1.  *Confrontation Clause Analysis*

We turn to the relevant analysis. The Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." In *Crawford*, the United States Supreme Court concluded that the Sixth Amendment's confrontation guarantee applies to "testimonial" hearsay statements admitted against a defendant in a criminal trial. *Crawford*, 541 US at 53. According to the Supreme Court, testimonial hearsay statements are admissible only if the declarant is unavailable and the defendant had the opportunity to cross-examine the declarant. *Id.* at 68.

In *Cook*, the Oregon Supreme Court addressed the meaning and application of *Crawford* in a case in which the defendant and two accomplices were charged with multiple counts of aggravated murder. 340 Or at 533. The accomplices, while in police custody and in response to police questioning, made statements that inculpated the defendant and undermined his defense. *Id.* at 543. The accomplices then pleaded guilty to several counts; their plea agreements did not require them to testify against the defendant at his trial. *Id.* at 533. The defendant moved to exclude the accomplices' statements on the ground that they were hearsay, the admission of which would violate his confrontation rights under the

state and federal constitutions. The trial court admitted the statements, and the defendant appealed.

The Supreme Court noted that, although *Crawford* does not provide a comprehensive definition of the critical term "testimonial," it is nevertheless clear that a "recorded statement, knowingly given in response to structured police questioning, qualifies under any conceivable definition." 340 Or at 542 (quoting *Crawford*, 541 US at 52, 53 n 4 (internal quotation marks omitted)). Turning to the statements at issue, the Oregon court readily concluded that, under *Crawford*, the challenged statements were testimonial, that the witnesses were unavailable, and that the defendant had had no opportunity to cross-examine them. Accordingly, the court concluded, admission of the statements violated the defendant's Sixth Amendment confrontation right. *Id.* at 543.

2. *Application*

a. Are the statements "testimonial"?

Under *Crawford* and *Cook*, we must first determine whether the challenged statements were "testimonial." As did the Oregon Supreme Court in *Cook*, we readily conclude in this case that all of the redacted statements at issue here—specifically, the statements that Hudson made to Detectives Stoelk, Quakenbush, and Rawlins; the statements that Silsby and Morgan made to Detective Graham; and the statements that Jacobs made to Detective Quakenbush—were "testimonial" for Sixth Amendment purposes.

b. Were the declarants unavailable?

Under *Crawford* and *Cook*, we must next consider the availability of the relevant declarants. We begin with Hudson's statements to Stoelk, Quakenbush, and Rawlins, because the answer is straightforward. The parties do not dispute that Hudson was unavailable to testify at trial and that defendant had no prior opportunity to cross-examine him. Accordingly, Hudson's testimonial statements to Stoelk, Quakenbush, and Rawlins are subject to *Crawford*.

Hudson's statements to Silsby, Morgan, and Jacobs—which they later recounted to Salem police detectives—pose a slightly more complicated analysis. Those statements constituted multiple hearsay, each level of which

was subject to the rule against hearsay and exceptions thereto. *See, e.g., State v. Smith,* 194 Or App 697, 703, 703 n 2, 96 P3d 1234 (2004) (testimony in which witness quotes one out-of-court declarant who in turn quotes another out-of-court declarant constitutes double hearsay as to which each of the multilevel statements must satisfy a hearsay exception or be categorized as not hearsay; citing OEC 805). To be sure, the analyses for purposes of the hearsay rule and for purposes of the Confrontation Clause are not "coextensive." *See* Laird C. Kirkpatrick, *Oregon Evidence* § 802.03[2] (4th ed 2002 & 2006 Supp) (so noting). Nevertheless, it seems necessarily to follow from the United States Supreme Court's analysis in *Crawford,* that the rule of that case would apply to each level of hearsay. Consequently, the Confrontation Clause principle enunciated in *Crawford* is implicated only if one or more levels of multilevel hearsay involve both a testimonial statement and the unavailability of—and lack of prior opportunity to cross-examine—the declarant *of that statement.* Conversely, it is insufficient if, for example, an unavailable declarant makes a nontestimonial statement to another person, and that person then makes a testimonial statement regarding the former, but is available for cross-examination. Stated another way, in order for *Crawford* to apply to a multilevel hearsay statement, the two prerequisites to that application—a testimonial statement and an unavailable declarant—must coincide on at least one level.

■ Here, even assuming that Silsby, Morgan, and Jacobs made testimonial statements to police officers, none of those persons was unavailable for cross-examination; each testified. Conversely, the statements of the unavailable declarant, Hudson, to those persons were not testimonial. Because the statement of each of those individuals to a police detective constituted the only level of testimonial evidence in the multilevel hearsay testimony of the relevant detective, and because each of them testified and was available for cross-examination, the redacted versions of their statements to the police are not subject to the rule articulated in *Crawford.* We therefore do not consider further whether admission of those statements violated defendant's Confrontation Clause rights.

  c. Were Hudson's statements admitted against defendant?

■  We turn, then, to the remaining question raised by defendant's Confrontation Clause challenge: whether the statements that are subject to *Crawford*—Hudson's testimonial statements to police detectives Stoelk, Quakenbush, and Rawlins—were admitted in evidence *against defendant*. That is, we consider whether the statements were sufficiently redacted, and the jury sufficiently instructed, to remove any Confrontation Clause infirmity in regard to defendant. Determining the answer to that question requires us to review three United States Supreme Court decisions: *Bruton*, *Richardson*, and *Gray v. Maryland*, 523 US 185, 118 S Ct 1151, 140 L Ed 2d 294 (1998).

  In *Bruton*, the United States Supreme Court held that a defendant is deprived of his or her rights under the Confrontation Clause when a nontestifying codefendant's statement naming him or her as a participant in a crime is admitted in evidence in their joint trial, even if the jury is instructed to consider the statement only in relation to the codefendant. 391 US at 137. The Court explained that

> "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial."

*Id.* at 135-36 (citation omitted).

  In *Richardson*, the Court considered the constitutionality of a nontestifying codefendant's confession that had been redacted to omit all reference to the defendant— "indeed, to omit all indication that *anyone* other than [the nontestifying codefendant and a third, by-then-deceased, person] participated in the crime"—and that did not indicate on its face that it had been redacted. 481 US at 203 n 1 (emphasis in original). In concluding that the defendant's Confrontation Clause rights had not been violated, the Court

reasoned that, where the statement of a nontestifying code-fendant does not expressly incriminate the defendant but is linked to the latter only through other evidence at trial, it is less likely that the jury will be unable to follow the trial court's instructions not to apply the statement to the defendant. 481 US at 208. In addition, the Court reasoned that even facially incriminating statements can be made admissible through redaction. *Id.* at 208-09.

The Court rejected the suggestion that a defendant's confrontation rights be protected by affording separate trials whenever an incriminating statement of one defendant is sought to be used; the Court noted that "[j]oint trials play a vital role in the criminal justice system," serving the interests of justice by avoiding the necessity of repeated appearances by witnesses, avoiding inconsistent verdicts, and enabling more accurate assessment of relative culpability. *Id.* at 209-10. The Court also reasoned that the "price" of forgoing the use of codefendant statements would be "too high," given society's compelling interest in convicting those who violate the law. *Id.* at 210. The Court held that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Id.* at 211.

Finally, in *Gray*, the nontestifying codefendant's confession, which named and implicated the defendant in the commission of the crime, had been redacted by inserting the word "deleted" or "deletion" in place of the defendant's name. At trial, immediately after a police officer witness read the confession to the jury, the prosecutor asked the officer whether, after the codefendant confessed, the officer was "able to arrest [the defendant], is that correct?" The officer responded, "That's correct." 523 US at 188-89. Other witnesses testified that six persons, including the codefendant and the defendant, had participated in the crime. The trial court instructed the jury that the codefendant's confession was evidence only against the codefendant. *Id.* at 189. The Supreme Court noted that, unlike the redacted confession in *Richardson*, the confession at issue referred directly to the existence of the defendant. The Court explained that the

question therefore was "whether redaction that replaces a defendant's name with an obvious indication of deletion * * * still falls within *Bruton*'s protective rule." The Court held that it did. *Id.* at 192.

The Court noted that it may not always be obvious who the person is to whom a blank space, the word "deletion," or some other symbol refers. The Court nevertheless concluded that, "considered as a class," redactions of that type "notify the jury that a name has been deleted." *Id.* at 193-95. The Court reasoned further that, a redaction of that type allows a jury to realize—or even "encourag[es] the jury to speculate"—that the deleted material refers to the defendant, even when the state does not "blatantly" link the confession to the defendant, as occurred in that case. *Id.* at 193. The Court distinguished the confession in *Richardson*, which, the Court reasoned, was about a conversation between two participants in the crime but did not point directly to a third person—the defendant—at all. *Id.* at 195-96.

As to the inferences that a jury may draw from redactions, the Court explained that, in *Richardson*, the redacted confession allowed the jury to infer that the defendant was implicated only when the redacted material was linked with other evidence introduced at trial; accordingly, the redactions were sufficient to avoid a Confrontation Clause violation. Other types of inferences, however—for example, from a nickname to a proper name—are more readily drawn and therefore fall within the *Bruton* rule. *Id.* at 195-96. Applying the relevant principles, the Court concluded that the redactions at issue in that case—consisting of the substitution of blank spaces and the word "delete" for the defendant's name—were insufficient to avoid a Confrontation Clause violation. *Id.* at 197.

We applied the described principles in *Johnson*. In that case, a nontestifying codefendant's redacted confession repeatedly referred, albeit not by name, to another person who participated in the crime; for example, the confession stated that the codefendant drove to the scene of the crime with "the other person," that "the other individual * * *

struck the victim" with a gun, and that, after the nontestify-ing codefendant left the apartment, he "heard a shot." *Johnson*, 199 Or App at 312-13. We held that, by thus refer-ring to—indeed, emphasizing—the defendant's existence, the redactions, even combined with a precautionary jury instruction, were insufficient to avoid a violation of the defen-dant's Confrontation Clause rights as explicated in *Bruton*, *Richardson*, and *Gray*. *Id.* at 313. Accordingly, denial of the defendant's motion for a mistrial was beyond the trial court's discretion. We reversed and remanded for a new trial. *Id.* at 313-14.

With the foregoing precepts in mind, we turn to Hudson's statements admitted in this case. Because it is readily apparent to us that, of the challenged statements, the redacted version of Hudson's statement to Stoelk is the most detrimental to defendant's defense, we begin with that state-ment. Again, the first portion of the statement refers to Benson and defendant by name as persons Hudson knew and states that Hudson "attended high school with Ennis [that is, defendant] and considered him to be a friend for some time." The statement then describes the events on the day of Murphy's murder. In doing so, the statement refers to two vehicles going to the residence where Hudson was staying; states that Hudson "got into" one of the vehicles and went to a location and met the other vehicle; and states that "they" went to a house. The statement also reports that Hudson "saw Murphy get hit in the head with a handgun" and refers to Hudson packing up Murphy's tools "following directions by one of the other persons present." The statement states that Hudson "was handed a can of mace and told to go out in the garage and watch the guy in the garage" and that, while he was outside loading items into the U-Haul truck, he "heard two loud pop noises from inside the house." It states that the person who was at the house when Hudson arrived "left in a Chevy Blazer," that Hudson left "riding as a passenger in the U-Haul truck, and that, while doing so, "one of the others" handed him a gun.

Hudson's redacted statement has several salient fea-tures. First, it makes clear that Hudson went to the scene of the crime, Murphy's house, with at least two other people. It distinguishes between Murphy and the "other person" who

was at the house when Hudson arrived—that is, Perrotte—on the one hand, and the "other persons" with whom Hudson arrived, on the other, by expressly referring to Murphy by name throughout and referring to Perrotte as "[s]omeone else [who] was there," as "[t]he other person, who had been at the house when Hudson arrived," and as "the guy in the garage." Moreover, when referring to persons other than Murphy and Perrotte, the statement uses the plural form. For example, it refers to Hudson packing up Murphy's tools at the direction of "one of the other persons present" and to "one of the others" handing Hudson a gun in the U-Haul; it is logical to assume in both instances that the "persons" or "others" referred to included the two persons with whom Hudson went to Murphy's house and not to either Murphy or Perrotte.

Equally significantly, the statement expressly implicates those other persons in the criminal conduct that was occurring. For example, it states that Hudson "saw Murphy get hit in the head" and that Hudson "was handed a can of mace"; in addition, as we have noted, it states that Hudson packed up Murphy's tools at the direction of "one of the other persons present," and that, after Hudson left in the U-Haul, "one of the others" handed him a gun.

Finally, and most significantly, by beginning with the statement that Hudson "knows * * * [defendant]," that Hudson "attended high school with [defendant]," and that he "considered [defendant] to be a friend," the statement effectively identified one of the other participants in the events at Murphy's house as defendant. Specifically, we perceive no other logical reason that the statement would have included those initial references, by name, to defendant, and cannot imagine that the jury would have drawn any inference other than the inference that defendant was one of the "others" who were described elsewhere in the statement as having accompanied Hudson to Murphy's house and participated in the events that led to Murphy's death.

Thus, the redacted statement not only made the jury aware of the existence of other participants in the crime besides the nontestifying hearsay declarant, by repeatedly referring to "others"; it also, *on its face,* allowed the jury to

infer exactly who those others were. Accordingly, the statement's infirmities exceed those of the redacted statement in *Richardson*—which, again, did not expressly notify the jury that a third person, who could be the defendant, was present and which allowed such an inference only through links to other evidence admitted at trial. The statement's infirmities likewise exceed those of the redacted statement at issue in *Gray*—which, although it "notif[ied]" the jury that other persons besides the declarant participated in the crime, allowed an inference as to who those persons were only through links, albeit fairly obvious, to other evidence. Again, in this case, both the existence and the identity of the other participants in the crime were readily inferable from the redacted statement itself.

Hudson's redacted statement to Stoelk therefore was admitted against defendant for purposes of the Confrontation Clause. Because Hudson was not available for cross-examination, admission of the statement violated defendant's Confrontation Clause rights as explicated in *Crawford*.

We reach a similar conclusion with regard to the redacted versions of statements Hudson made to Detectives Quakenbush and Rawlins. Each of those statements, on its face, allowed the jury to infer the existence and presence of persons other than Hudson—the unavailable declarant—at the scene of Murphy's murder. We also conclude that, when linked with other evidence in the case, each of those statements allowed the jury to infer that one of those persons was defendant. Accordingly, where Hudson was unavailable for cross-examination, each of those statements was admitted against defendant in violation of his Confrontation Clause rights.

B.  *Harmless error analysis*

We turn to whether the admission of the statements nevertheless was harmless. *See Cook*, 340 Or at 543 (violation of federal Confrontation Clause right is trial error subject to federal harmless error analysis). Under the federal constitution, "an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a

reasonable doubt." *Delaware v. Van Arsdall*, 475 US 673, 681, 106 S Ct 1431, 89 L Ed 2d 674 (1986); *Chapman v. California*, 386 US 18, 24, 87 S Ct 824, 17 L Ed 2d 705, *reh'g den*, 386 US 987 (1967); *see also Cook*, 340 Or at 544. Whether an evidentiary error is harmless in a particular case depends on a number of factors including the importance of the evidence, whether the evidence was cumulative, the presence or absence of evidence corroborating or contradicting the evidence, and the overall strength of the prosecution's case. *Van Arsdall*, 475 US at 684; *Cook*, 340 Or at 544.

■ We begin, as did the Supreme Court in *Cook*, by determining the particular evidentiary issues that are subject to our harmless error analysis. *See id.*, 340 Or at 544-45 (where the defendant had asserted "defense of others" defense to murders, "sole issue" that the court was required to consider under applicable harmless error analysis was whether erroneously admitted evidence, when considered in context of all properly admitted evidence, "uniquely established" the defendant's state of mind when he shot the victims). Here, as we have noted, the state and Benson agreed that Benson actually shot Murphy. Defendant's theory was that there were other participants in the underlying crime of burglary; that he himself neither committed the homicidal act nor encouraged it; that he was not armed; that he had no reasonable grounds to believe that any other participant was armed; and that he did not believe that any other participant intended to engage in conduct likely to result in a death. *See* ORS 163.115(3) (setting out those factors constituting an affirmative defense to a charge of felony murder under ORS 163.115(1)(b)). Defendant had the burden of proving the elements of his asserted affirmative defense by a preponderance of the evidence. ORS 161.055(2). Accordingly, in determining whether admission of the challenged statements is harmless, we consider, in light of other evidence relevant to the defense, the extent, if any, to which each of the challenged statements impaired defendant's ability to prove the defense.

We first apply the stated principles to the redacted version of Hudson's statement to Stoelk, which, as previously noted, patently was the most detrimental of the challenged statements to defendant's affirmative defense under ORS 163.115(3). The statement provided evidence, or permitted

the inference, that Hudson went to Murphy's house with two other persons and that a person or persons other than Hudson hit Murphy on the head with a handgun; directed Hudson to pack up Murphy's tools; handed Hudson a can of mace and told him to go and watch Perrotte in the garage; shot Murphy; and, as the men left the scene, handed Hudson a small black pistol. Specifically, the statement permitted the inference that defendant did one, some, or all of those things. It follows that the statement impaired defendant's ability to prove the factors in ORS 163.115(3) pertaining to whether defendant did not commit or assist in the homicidal act and was not armed. ORS 163.115(3)(b), (c). In addition, the statement impaired defendant's defense by generally permitting the inference that the three persons worked together in carrying out the described conduct, evidence that was harmful to the factors relating to whether defendant had any reasonable ground to believe that any other participant was armed or intended to engage in conduct likely to result in death. ORS 163.115(3)(d), (e).

We next weigh the effect of that evidence against other evidence relevant to those factors. As described above, Perrotte expressly testified that defendant was armed; that, when Benson and Murphy were in the house, defendant threw duct tape into the house; that defendant directed others to collect and remove items from Murphy's residence; and that defendant watched Perrotte while other events took place. That testimony was relevant to the factors set out in ORS 163.115(3)(b) and (c), pertaining to whether defendant aided in the commission of the homicidal act and whether defendant was armed. Perrotte also testified, however, that, at the time of the murder, he had been smoking methamphetamine, may have drunk a beer, and "had a buzz." He also testified that, on several occasions, he lied to police about the events surrounding the murder.

As previously discussed, defendant himself testified that he took two people with him to Murphy's house because he needed a truck; he denied that he "organized" the ensuing events or intended to harm Murphy. He also specifically testified that he did not aid in any way in Murphy's death, that he was not armed, that he did not believe that Benson or Hudson had weapons, that he did not expect Benson to

engage in conduct likely to result in Murphy's death, and that he had no indication that there was going to be a fight. Benson testified that he did not see defendant with a firearm and that defendant did not know that Benson had a gun; that he had not given defendant any indication that he intended to assault Murphy or engage in conduct likely to result in Murphy's death; and that defendant did not encourage him in carrying out that conduct.

Also as discussed above, the statements of Silsby, Morgan, and Jacobs to Salem police detectives did not themselves implicate defendant's Confrontation Clause rights. Testimony regarding those statements, as well as other testimony by those witnesses at trial, therefore is also part of the record for the purposes of assessing whether admission of redacted versions of Hudson's statements to police was harmless. The statements of all three confirmed that one or more other persons went to Murphy's house with Hudson and that there was an altercation and/or a shooting; Silsby and Jacobs both confirmed that items were taken from the house. However, at trial, Silsby claimed not to recall Hudson's statements to her or her statements to the police; Morgan testified that, at the time he spoke to police, he was "unclear" about what had occurred; and Jacobs testified that his statement to police was not accurate.

We conclude that none of the described evidence was sufficient to render the erroneous admission of Hudson's redacted statement to Stoelk harmless beyond a reasonable doubt. Most significantly, we conclude that Perrotte's testimony—considered in light of Perrotte's own admissions that he had been using intoxicants and had lied to police, and considered in light of defendant's and Benson's contrary testimony—was not sufficient for that purpose.

Having so determined, we need not consider whether the erroneous admission of any of Hudson's other statements to the police was harmless beyond a reasonable doubt, that is, the extent to which, viewed in light of the record as a whole, admission of any of the remaining challenged statements impaired defendant's affirmative defense under ORS 163.115(3). That is because, even assuming that the

admission of any of those remaining statements was harmless, defendant is entitled to a new trial based on the erroneous, and not harmless, admission of Hudson's statement to Stoelk. Conversely, even assuming that the admission of one or more of the remaining statements was harmful, defendant will be entitled to no greater relief on that ground than that to which he is entitled on the basis of the erroneous admission of Hudson's statement to Stoelk.

Reversed and remanded.