Argued and submitted July 31, 2008, affirmed August 5, petition for review denied
October 21, 2009 (347 Or 290)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JOEL SIERRA-DEPINA,
aka Joel Sierradepina,
aka Joel Sierra De Pina,
*Defendant-Appellant.*

Multnomah County Circuit Court
051154527; A131213

213 P3d 863

Marc D. Brown, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Janet A. Klapstein argued the cause for respondent. On the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Kaye E. McDonald, Senior Assistant Attorney General.

Before Rosenblum, Presiding Judge, and Brewer, Chief Judge, and Armstrong, Judge.*

BREWER, C. J.

---

* Armstrong, J., *vice* Richardson, S. J.

## BREWER, C. J.

Defendant appeals a judgment of conviction for one count of harassment, ORS 166.065.[1] He contends that the trial court erred by denying his motion *in limine* to exclude translated statements that the victim made to the investigating police officer through an interpreter. The sole basis of defendant's argument to the trial court and his briefing on appeal is that, because the interpreter was not made available for cross-examination, the admission of those statements violated his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution as construed by the United States Supreme Court in *Crawford v. Washington*, 541 US 36, 124 S Ct 1354, 158 L Ed 2d 177 (2004). The state responds that the trial court did not err, because *Crawford* applies only to testimonial statements and an interpreter's statements are not testimonial. In addition, the state contends that, even if the trial court erred, any error in admitting the translated statements was harmless. We conclude that any error in admitting the translated statements, even if they were testimonial, was harmless. We therefore affirm.

■ Where a jury returns a guilty verdict, we ordinarily state the facts in the light most favorable to the state. Here, however, because we resolve this case on the basis of harmless error, we "review all pertinent portions of the record, not just those portions most favorable to the state." *State v. Maiden*, 222 Or App 9, 11, 191 P3d 803 (2008), *rev den*, 345 Or 618 (2009).

The victim, Font, is defendant's girlfriend. One evening, the couple visited some friends, and Font, by her own testimony, consumed at least six beers and became intoxicated. After midnight, the couple returned to their apartment complex.

---

[1] As pertinent to this case, ORS 166.065 defines the crime of harassment as follows:

"(1) A person commits the crime of harassment if the person intentionally:

"(a) Harasses or annoys another person by:

"(A) Subjecting such other person to offensive physical contact[.]"

The managers of the complex, Randy and Cynthia Thompson, live on-site in a cottage near the driveway entering the complex from the street. Both were up late that night watching a movie. Cynthia Thompson's attention was attracted outside when she noticed a car drive into the complex "kind of quickly"; shortly later she heard crying and yelling outside. Looking out a sliding glass patio door to a point 20 to 25 feet away, she saw Font, defendant, and another man standing in front of the Thompsons' garage door, and observed that defendant "had his right arm around her head. She was kind of bent over. He was standing up. She was bent down * * *, and he was hitting her[.]" On cross-examination, Cynthia Thompson reiterated her impression of what she had observed:

"Q. And you also did not see—couldn't tell whether Ms. Font was struggling with the person that supposedly punched her that night.

"A. The question, could I see if she was struggling?

"Q. Right.

"A. Yeah. She was trying to pull away, and he was pulling her toward—with his arm towards—into—into his body.

"Q. So you couldn't tell if he was trying to carry her off or any—

"A. Oh no, I could tell. He was hitting her. It was absolutely clear. There's a motion light on my back patio. The bulbs go like this. There's also a motion light that we've installed at the entrance of the property, which shines onto the garage door. Around the area where they were standing there's a lamp post. It was very well lit. I could see exactly what he was doing."

Cynthia Thompson asked her husband to come look outside. Randy Thompson noted that the area where defendant and Font were struggling was well lighted by several flood lights and a streetlight, and that he "had a very clear view." Randy Thompson described what he saw through the window:

"[Defendant] had [Font] in a headlock and was slapping her in the face and it looked like he was just roughing her up,

and then shortly after that she—it looked like she lost her balance and went down to the ground and on her rear end and then got back up and he got her in another headlock, and I saw him punch her in the face with a closed fist. At that point they were both facing my direction."

Randy Thompson also noted that he saw defendant "hit her in the face and her head went back." He explained that he could not say with certainty whether Font fell down because she lost her balance or because she was pushed. He did see that she "fell on her behind but not all the way to the ground. She put her hands down and caught herself and then got back up. " He did not see her hit her head on the ground.

Randy Thompson went outside, and defendant let go of Font and walked away. Font was "pretty messed up in the face" and was starting to get a black eye, and she was crying. Randy Thompson asked Font if she was okay, and she said no; he asked her if she wanted him to call the police, and she said yes.[2]

Font and the Thompsons went into the apartment complex office and waited for the police. Cynthia Thompson thought Font "looked pretty beat up." While they waited in the office for the police—a period of about 20 minutes—Font continued to cry and appeared upset.

Portland Police Officer Jeardeau responded to the call. He observed that Font's left eye was turning black and blue but that there were no abrasions around that eye. Jeardeau testified that Font's black eye was consistent with "a strike to the eye," not "by any abrasion with pavement or concrete." He explained:

"When I find people who have been—hit the pavement, a lot of times they're falling—You fall at an angle * * * you're going to catch the high point of your face and it's going to scrape it up. To get a black and blue eye on the inside, that shouldn't happen without any abrasions, really. Right around the eye socket, we're going to have a high point."

---

[2] Font primarily speaks Spanish; she testified that she understands some English but that she does not speak it well. Those exchanges were in English, and Font also testified that Randy Thompson asked her if she was okay and if she wanted him to call the police; however, she also testified that she did not understand Randy Thompson very well.

Jeardeau took photos of Font's face, showing the developing black eye, which were introduced at trial. Jeardeau observed that Font was crying and angry, and he could tell that she had been drinking, both from odor and Font's physical appearance.

Although Font understands some English, she primarily speaks Spanish and she communicated with Jeardeau through an interpreter. The interpreter, whom both Font and Randy Thompson knew, lived in the apartment complex. Both Thompson and Jeardeau testified that the interpreter spoke English well. The account rendered by Font to Jeardeau through the interpreter was as follows: Defendant and Font had an argument, and defendant pushed her down onto the pavement, where she hit her face. No one asked Jeardeau whether he had asked Font, through the interpreter, if defendant had slapped or punched her; there is no evidence in the record of what, if anything, Font told Jeardeau on that point.

Font testified at trial, as noted above, that she had been drinking that night and had become intoxicated; she further testified that she remembered only "seventy or eighty percent" of the evening. She was wearing high heels and it was drizzling; when she got out of the car at her apartment complex, she slipped and fell. She fell a second time, and that time she hit her face hard enough to cause bleeding. She wanted to go back to her friends' house, but defendant, who knew she was drunk, held her back so that she would not go and continued to hold her while she struggled. According to Font, defendant never held her around the neck; instead he held her by her shoulders. The following exchange occurred between the prosecutor and Font:

"Q. When your boyfriend was grabbing onto you and you were trying to get away, did that—was his action something that annoyed you?

"A. Well, perhaps, since I was drunk and I was a little bit aggressive. Maybe it bothered me that he wouldn't let me go (inaudible)."

Font denied having told Jeardeau, through the interpreter, that defendant had pushed her down; she

explained that the interpreter had been in the United States less than 18 months and that his English was not very good.

Font confirmed that defendant walked away when Randy Thompson came outside, but explained that this was because defendant was tired of holding her and saw that someone else would take care of her. Font admitted that she was crying and upset, but maintained that was because she still wanted to go out to the street and back to her friends' house. Font testified that she and defendant were both from Cuba; she denied being concerned about defendant possibly having immigration trouble because of this incident.

Like Font, defendant testified that, after they had returned to the apartment complex, Font wanted to return to her friends' house. He did not want her to go because she wanted to drive and was too drunk to do so; he held onto her and tried to calm her down. Defendant testified that he held Font by her shoulders to keep her from leaving, never by the neck. He denied that either he or Font was yelling, or that he punched her. Instead, according to defendant, at one point, when Font turned to try to go out to the street, she slipped and fell. Defendant explained that he left Font with an unidentified friend to find the friends whom he and Font had been visiting; he thought that, because she wanted to see them, it would calm her if he could bring them to her. Later that day, when Font told him that the police were looking for him, defendant turned himself in.

■ As noted, on appeal defendant argues that allowing Jeardeau to testify about what Font told him at the scene through the interpreter violated his right to confrontation under the Sixth Amendment as construed in *Crawford*. In defendant's view, the interpreter's statements themselves constituted testimonial evidence by a declarant whom defendant did not have the opportunity to cross-examine and, accordingly, evidence about those statements should have been excluded.

The state responds that the interpreter's statements were not testimonial and therefore admitting the statements did not violate defendant's right to confrontation under the federal constitution. Alternatively, the state contends that any error in admitting the evidence against defendant was

harmless. We agree with the state that any error in admitting the interpreter's statements was harmless and, accordingly, we do not address the question of whether it was error under the federal constitution to admit them.

■■　　We analyze the violation of federal constitutional rights, such as the right to confront witnesses, under the federal harmless error test. *State v. Cook*, 340 Or 530, 544, 135 P3d 260 (2006) (citing *Chapman v. California*, 386 US 18, 23, 87 S Ct 824, 17 L Ed 2d 705 (1967)). The deprivation of such a right is harmless error when the reviewing court, in examining the record as a whole, can say, beyond a reasonable doubt, that the error did not contribute to the determination of guilt. *State v. Pitt (A120428)*, 212 Or App 523, 527, 159 P3d 329 (2007) (citing *Chapman*, 386 Or at 24).

■　　We begin by identifying the particular evidentiary issue that is the subject of the harmless error analysis. *State v. Ennis*, 212 Or App 240, 262, 158 P3d 510, *rev den*, 343 Or 223 (2007). We then review the whole record to determine whether the evidentiary error was harmless, considering " 'the importance of the [improperly admitted] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, * * * and, of course, the overall strength of the prosecution's case.' " *Cook*, 340 Or at 544 (quoting *Delaware v. Van Arsdall*, 475 US 673, 684, 106 S Ct 1431, 89 L Ed 2d 674 (1986) (bracketed material and omission in *Cook* )); *see also Ennis*, 212 Or App at 262 (setting out *Van Arsdall* factors).

　　As noted, defendant argues that the translated statements that Font, the victim, made to Jeardeau, the investigating police officer, should have been excluded. The state's questions and Jeardeau's answers regarding those translated statements were as follows:

　　"Q.　What did [Font] tell you through her friend who was translating?

　　"A.　[She s]aid that she had an argument in the parking lot with her boyfriend of four years, and during the argument he pushed her down onto the blacktop on the pavement.

"Q. Is that all she said about the incident?

"A. I believe it was, and she said and that's where she hit her face, on the ground."

Reviewing the entire record in light of the *Cook* factors, we conclude that any error in admitting those statements was harmless. To find defendant guilty of harassment, the jury had to find that he harassed or annoyed Font by subjecting her to offensive physical contact. *See* ORS 166.065 (defining crime of harassment). Font's translated statements that defendant pushed her down and that she hit her face on the ground are relevant to whether defendant subjected Font to offensive physical contact. Here, as the state argues, the evidence establishing that defendant subjected Font to offensive physical contact by hitting her in the face was strong. Two witnesses testified that they saw defendant hitting Font in the face, which the parties do not dispute is offensive physical contact. Although it was late at night, both witnesses were awake before they saw defendant and Font. They had a direct view from a relatively close and well-lighted vantage point, and their accounts were both affirmative and consistent that defendant hit Font in the face. Cynthia Thompson testified, "He was hitting her. It was absolutely clear." Randy Thompson testified, "I saw him punch her in the face with a closed fist." Both Randy Thompson and Jerdeau testified that, soon after the incident, Font was developing a black eye, an injury consistent with having been punched in the face.

Defendant argues, nonetheless, that the admission of Font's translated statements was not harmless because this case turns on Font's credibility. According to defendant, Font's translated account was inconsistent with her trial testimony; because the jury heard two different accounts from Font about what happened, it cannot have been harmless to introduce one of those accounts.

Notably, however, some of Font's translated account *is* consistent with her trial testimony. Font's translated account of how she hurt her eye—the account to which defendant objects—would tend to support, not undermine, defendant's case. Font stated on the night of the incident that she hurt her face by hitting the pavement when she fell on the

ground. That account is consistent with Font's trial testimony that she fell and hit her face. Because it would support the credibility of her testimony to the same effect at trial, any error in admitting Font's statement about how she hurt her face was harmless to defendant's case.

The challenged statements also include an account of how Font fell. Font's translated statement to Jeardeau at the scene indicated that defendant pushed her. That statement is inconsistent with her trial testimony that she slipped. The other evidence tending to establish that defendant pushed Font was weak. Randy Thompson initially testified that "it looked like she lost her balance." The state then asked Thompson if he was able to tell whether Font lost her balance or was pushed, and he responded, "I couldn't say for sure if there—if—I thought that she was pushed, but I couldn't say for sure." Cynthia Thompson, the other eyewitness, was not questioned on that point. Like Font, defendant testified at trial that she had slipped. Given the conflicting and equivocal nature of the evidence about why Font fell, it is unsurprising that the state, in its closing argument to the jury, more strongly emphasized evidence indicating that defendant had hit Font in the face and the theory that hitting her in the face was offensive physical contact.[3] Moreover, in light of the weakness of the state's case based on the theory that defendant pushed Font down, we think it unlikely that the jury resolved the case on that basis.

However, even if the jury found as a matter of fact that Font slipped, the jury would have been entitled to find beyond a reasonable doubt that defendant subjected Font to offensive physical contact by hitting her in the face. As noted, the evidence in support of the theory that defendant subjected Font to offensive physical contact by hitting her in the face was very strong. Font's translated statement that defendant pushed her down was not relevant to that theory of the case. As the state noted to the jury in closing argument, "what the victim said at the time doesn't really change

---

[3] In closing argument, the state emphasized several times that it was relying on the evidence that defendant had punched Font. For example, the prosecutor at one point stated, "You're not deciding whether or not he was entitled to hold her to keep her from driving drunk. The allegation here is that he punched her."

whether or not she was punched. What the interpreter said at the time doesn't really change the fact of being punched or not being punched."

In short, Font's credibility was at issue only as to a point that was not pertinent to the state's primary theory of the case at trial, a theory for which the evidence was compelling. Because Font's statement that defendant pushed her was not important to the state's overall case and because the evidence in support of its primary theory was strong, we conclude, beyond a reasonable doubt, that any error in admitting Font's translated statement that she was pushed did not contribute to the jury's determination that defendant harassed or annoyed Font by subjecting her to offensive physical contact. Any error in admitting Font's translated statements was harmless.

Affirmed.